**BLOOMBERG L.P., Plaintiff,**

v.

**BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, Defendant.**

**No. 08 Civ. 9595 (LAP).**

United States District Court, S.D. New York.

Aug. 24, 2009.

Scott Sanford Rose, Thomas H. Golden, Jared Errol Cohen, Willkie Farr & Gallagher LLP, New York, NY, for Plaintiff.

Yvonne Facchina Mizusawa, Board of Governors of the Federal Reserve System, Washington, DC, for Defendant.

## OPINION AND ORDER

LORETTA A. PRESKA, Chief Judge.

This action concerns whether the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, compels the Board of Governors of the Federal Reserve System (the "Board"), when responding to FOIA requests, to search for records held at the Federal Reserve Bank of New York ("FRBNY") and the applicability of FOIA Exemptions 4 and 5 to certain records currently in the Board's possession. This dispute first arose when Bloomberg L.P. ("Bloomberg") reporters Mark Pittman and Craig Torres each submitted FOIA requests (the "FOIA Requests") to the Board requesting information about the Federal Reserve System's extraordinary actions taken in early 2008, during one of the worst financial crises in the history of this nation. In response to the FOIA Requests, the Board conducted an internal search for records held by the Board only, identified certain documents as responsive to the FOIA Requests, but withheld those documents pursuant to FOIA Exemptions 4 and 5. Bloomberg sued to compel the disclosure of the documents and to require the Board also to search records held at the FRBNY.

Both Bloomberg and the Board now move for summary judgment on those issues [see dkt. nos. 10 and 18]. For the reasons set forth herein and as detailed below, Bloomberg's motion is GRANTED, and the Board's motion is DENIED.

## I. BACKGROUND

### A. Overview and Lead–Up to the FOIA Requests

A brief overview of the Federal Reserve System structure is helpful for understanding the circumstances of this action. The Federal Reserve System is the Central Bank of the United States. It is composed of the Board, located in Washington, D.C., and twelve regional Federal Reserve Banks (the "FRBs"). *The Federal Reserve System: Purposes and Functions* 3 (9th ed., June 2005) [hereinafter *P & F*]. Collectively, the Board and the FRBs fulfill the four overriding purposes of the Federal Reserve System: conducting the nation's monetary policy, supervising and regulating banking institutions, maintaining the stability of financial systems and markets, and providing financial services to major financial actors. *See id.* at 1–2. The Federal Reserve System considers itself to be an independent central bank because its decisions do not require ratification by the President or executive branch officials. *Id.* at 3. The System is, however, subject to oversight by Congress. *Id.*

While together the Board and the FRBs comprise the Federal Reserve System, they have independent mandates and re-

sponsibilities. The Board is a federal agency tasked with, *inter alia*, supervising or regulating the operations of the FRBs, reviewing and approving changes to interest rates charged by the FRBs and overseeing loans among and by the FRBs. *Id.* at 4; *see also* 12 U.S.C. § 248. An additional component of the Federal Reserve System is the Federal Open Market Committee ("FOMC"), a separate governmental agency that shares offices with the Board. *See* 12 U.S.C. § 263. The FOMC is made up of the members of the Board, the president of the FRBNY, and presidents of four other FRBs, who serve on a rotating basis. *P & F* at 3. "The FOMC oversees open market operations, which is the main tool used by the Federal Reserve to influence overall monetary and credit conditions." *Id.*

The FRBs, on the other hand, are semi-autonomous institutions with private funding and independent corporate structures.[1] Congress chartered the FRBs and granted them distinct powers, apart from the powers granted to the Board, such as the power to sue and be sued in their own names, to make contracts, to appoint officers, hire and fire employees and prescribe bylaws through their boards of directors. *See* 12 U.S.C. §§ 341–361. FRBs do not receive appropriated funds from Congress but rather generate funds from stock issuances to depository institutions in their districts. *See* 12 U.S.C. §§ 222, 282, 321, 341. Each FRB has a nine member board of directors, six of whom are elected by shareholder banks within the FRB's district and three appointed by the Board. *See* 12 U.S.C. §§ 301–302. The FRBs' role within the Federal Reserve System is generally supportive of the Board, "carrying out a variety of System functions, including operating a nationwide payments

system, distributing the nation's currency and coin, supervising and regulating member banks and bank holding companies, and serving as banker for the U.S. Treasury." *P & F* at 4. The FRBs give all revenue in excess of expenses to the U.S. Treasury. 12 U.S.C. § 289.

A central feature of the FRBs is their administration of the discount window lending program ("DW"), meant to relieve pressures on the interbank funds market and a means for providing emergency liquidity to qualifying depository institutions during times of systemic stress. (*See* Decl. of Susan E. McLaughlin ¶ 5.) "Access to discount window credit is established by rules set by the [Board], and loans are made at interest rates set by the [FRBs] and approved by the Board. Depository institutions decide to borrow based on the level of the lending rate and their liquidity needs." *P & F* at 31. While the Board regulates DW lending, *see* 12 U.S.C. § 347b, the Board has no input or involvement in the administration of specific DW loan requests. (Decl. of Susan E. McLaughlin ¶ 8.) FRBs publish DW interest rates, but information on the names of depository institution borrowers, collateral pledged by the borrowers, individual loan amounts, or the specific type of DW program borrowed from is not publicly disclosed. (*Id.* ¶ 9.) At least with respect to the FRBNY, loan and collateral documentation relating to each DW loan is maintained at the bank, and that information is maintained on a need-to-know basis. (*Id.*)

In 2007, the U.S. economy encountered a serious financial crisis. In late 2007, responding to deteriorating market conditions, the Board authorized the FRBs to establish a new lending facility for deposi-

---

1. Statutes and regulations often refer to the FRBs as "fiscal agents" of the Government. *See, e.g.,* 12 U.S.C. § 391; 31 C.F.R. § 210.7.

tory institutions called the Term Auction Facility ("TAF"). (Decl. of Brian F. Madigan ¶ 7.) In March 2008, the Board also authorized only the FRBNY to create additional lending programs to give primary dealers access to liquidity: the Primary Dealer Credit Facility ("PDCF") and the Term Securities Lending Facility ("TSLF"). (*Id.;* Decl. of Susan E. McLaughlin ¶ 10.) The FRBNY does not publish any information on PDCF loans, other than aggregate information on PDCF borrowing. (Decl. of Susan E. McLaughlin 16.) Information about the other lending programs is maintained internally at the FRBNY or, in the case of TAF loans, internally at each FRB. (Decl. of Brian F. Madigan ¶ 12.)

In March 2008, Bear Stearns, one of the largest securities firms in the United States, notified members of the Federal Reserve that due to deteriorating market conditions it would be unable to repay a large portion of its obligations and thus faced the prospect of filing for bankruptcy protection. On Friday, March 14, 2008, in order to avoid serious harm to the financial markets if Bear Stearns collapsed, the Board authorized the FRBNY to extend credit to Bear Stearns through JPMorgan Chase Bank, N.A. ("JPMC"). That day, the FRBNY made an overnight DW loan of $12.9 billion to JPMC and took as collateral Bear Stearns assets with a value of $13.8 billion. On Monday, March 17, 2009, JPMC and Bear Stearns repaid the FRBNY the $12.9 billion loan in full with interest of nearly $4 million.[2]

The Board is subject to the Freedom of Information Act, promulgates regulations regarding FOIA compliance, and maintains designated personnel to respond to FOIA requests. *See* 12 C.F.R. §§ 261.12–.17. The FOMC also considers itself a separate governmental agency for FOIA purposes and publishes FOIA regulations. *See* 12 U.S.C. § 263; 12 C.F.R. §§ 271.1–271.9. The FRBs, however, consider themselves private corporations and issue no published FOIA regulations.

## B. *The Loan Request*

On May 21, 2008, Bloomberg reporter Mark Pittman submitted to the Board a FOIA request (the "Loan Request") seeking:

> For all securities posted between April 4, 2008 and May 20, 2008 as collateral to the Primary Dealer Credit Facility, the discount window, the Term Securities Lending Facility, and the Term Auction Facility (the "Relevant Securities"), we request copies of:
>
> 1. all forms and other documents submitted by the party posting the Relevant Securities as part of the application for the loan;
>
> 2. all receipts and other documents given to the party posting the Relevant Securities as part of the application for the loan;
>
> 3. records sufficient to show the names of the Relevant Securities;
>
> 4. records sufficient to show the dates that the Relevant Securities were accepted and the dates that the Relevant Securities were redeemed;
>
> 5. records sufficient to show the amount of borrowing permitted as compared to the face value, also known as the "haircut";
>
> 6. records sufficient to describe whether valuations or "haircuts" for the Relevant Securities changed over time;

---

**2.** *See* Press Release, Federal Reserve System, *Report Pursuant to Section 129 of the Emergency Economic Stabilization Act of 2008: Bridge Loan to the Bear Stearns Companies Inc. Through JPMorgan Chase Bank, N.A.* (undated); *available at* http://www.federalreserve. gov/monetarypolicy/files/129bearstearns bridgeloan.pdf.

7. records sufficient to show the terms of the loans and the rates that the borrowers must pay;

8. records sufficient to show the amount that the Federal Reserve has accepted of each of the Relevant Securities;

9. records sufficient to show which, if any, Relevant Securities have been rejected as collateral and the reasons for the rejections;

10. all databases and spreadsheets that list or summarize the Relevant Securities; and

11. records, including contracts with outside entities, that show the employees or entities being used to price the Relevant Securities and to conduct the process the lending.

(Decl. of Alison M. Thro ("Thro Decl.") ¶ 5, Ex. 1.) On June 19, 2008, the Board sent Bloomberg a letter extending the Board's period to respond to the Loan Request until July 3, 2008, "in order to consult with another agency or with two or more components of the Board having a substantial interest in the determination of the request." (*Id.* ¶ 6, Ex. 3.)

Alison M. Thro, Senior Counsel of the Board and a member of its Legal Division, searched for documents responsive to the Loan Request by contacting seven staff members in the Board's division of Monetary Affairs ("MA"), including the MA director, deputy director, senior associate director and deputy associate director. The MA provides the Board with information and analysis pertaining to the FRBs' administration of the DW, TAF, PDCF and TSLF lending programs. (*Id.* ¶ 8.) An MA staff member informed Ms. Thro of the existence of a document potentially responsive to item 11 of the Loan Request, identifying an external firm from which the FRBs purchase pricing data. (*Id.* ¶ 15.) Other MA staff members informed Ms. Thro that during the Loan Request

time period, the FRBs sent daily data feeds (weekdays only) to the MA, consisting of transaction-level information about the DW, TAF, PDCF and TSLF programs. MA staff used this data to generate daily reports (weekdays only) that listed outstanding extensions of credit under the DW, TAF, PDCF and TSLF programs (the "Remaining Term Reports").

The Remaining Term Reports consist of 231 pages of information and include the names of borrowers, the originating FRB district, individual loan amounts, the type of lending program borrowed from, and loan origination and maturity dates. (*Id.* ¶¶ 11, 13; Board's Local Rule 56.1 Stmt. ¶ 5.) The Remaining Term Reports do not identify the interest rates on the loans, specific items of collateral pledged for the loans, the haircuts applied to the collateral, or other information responsive to the Loan Request. (Thro Decl. ¶ 11.)

Ms. Thro also contacted six staff members in the Reserve Bank Operations and Payment Systems ("RBOPS") division of the Board, which oversees the FRBs' provision of financial services to depository institutions and other eligible borrowers. (*Id.* ¶ 17.) Ms. Thro found that the RBOPS staff members had no responsive documents, other than the Remaining Term Reports and the document potentially responsive to item 11 of the Loan Request. The MA and the RBOPS were the only two divisions of the Board Ms. Thro considered reasonably likely to have responsive documents "because no other division [of the Board] had responsibility directly to oversee the Reserve Banks' provision of DW, TAF[, PDCF and TSLF] services to eligible institutions or to provide data and statistics to Board staff relating to" those lending programs. (Board's Local Rule 56.1 Stmt. ¶ 3; Thro Decl. ¶ 18.)

Ms. Thro also interviewed certain staff of the FRBNY but did not search any records at the FRBNY because she "determined that [ ] transaction-level documents at the FRBNY were not records of the Board subject to FOIA." (Thro Decl. ¶ 21.)

On December 9, 2008 (after Bloomberg filed its Complaint and Amended Complaint in this action), the Board sent Bloomberg a letter granting in part and denying in part the Loan Request. The Board stated that it located documents responsive to item 11 of the Loan Request and offered to provide those documents. The Board also stated that it had located approximately 231 pages of responsive documents (the Remaining Term Reports) but stated that it would withhold that information pursuant to FOIA Exemptions 4 and 5.[3] The Board also stated its view that documents held by the FRBNY are not subject to FOIA request made to the Board. (*Id.,* Ex. 5.)

### C. The Bear Request

On April 7, 2008, Bloomberg reporter Craig Torres submitted a FOIA request (the "Bear Request") to the Board requesting "[a]ll documents reflecting or concerning the portfolio of securities (listed on a security-by-security basis, with CUSIP numbers if available), supporting the loan extended by the Federal Reserve in connection with the proposed acquisition of Bear Stearns Cos. by JP Morgan Chase & Co." (*Id.* ¶ 22, Ex. 6.)

In planning a search for documents related to the Bear Request, Ms. Thro was aware of an extant electronic document repository that had been created after the Board's March 14, 2008 authorization of the Bear Stearns loan. (*Id.* ¶ 23.) The Board had created the document reposito-

ry in order to respond to other FOIA requests and Congressional requests for information related to the Bear Stearns loan. Before the Board received the Bear Request, the developers of the document repository had already contacted approximately 80 Board staff members in seven divisions (MA, RBOPS, Office of Board Members, Office of Secretary, Legal, International Finance, and Bank Supervision and Regulation) who were identified as having been involved in any aspect of the Bear Stearns loan matter. By interviewing core staff members involved in the Bear Stearns loan matter and asking them to identify other individuals who were involved, Ms. Thro, who was among the developers of the document repository, was satisfied that she had identified all staff members likely to have relevant documents. By the end of June 2008, the document repository contained over 28,000 pages of information, and Ms. Thro considered it to be a comprehensive gathering of all documents related to the Bear Stearns matter. (*Id.* ¶¶ 24–25.) Staff members were also reminded of their continuing obligation to send to the repository any later-discovered documents related to the Bear Stearns matter. (*Id.* ¶ 24.)

In order to respond to the Bear Request specifically, Ms. Thro reviewed documents in the repository that came from Board members and Board staff members (approximately 34 in all) who she considered most likely to have had documents relating to securities pledged as collateral for the Bear Stearns Loan. Ms. Thro concluded that no repository records "contain[ed] any transaction-specific documents regarding securities posted as collateral for the Bear Stearns Loan." (*Id.* ¶ 25.) Ms. Thro also reinterviewed MA and RBOPS staff mem-

---

**3.** The Board presumably also provided around this time an index describing the withheld documents and the exemptions invoked, in accordance with *Vaughn v. Rosen,* 484 F.2d 820 (D.C.Cir.1973). (*See* Thro Decl., Ex. 4.)

bers about whether they had any additional documents related to the Bear Stearns matter but received no responsive documents. (*Id.* ¶ 26.)

Finally, Ms. Thro consulted with FRBNY staff members about documents they maintained regarding the Bear Stearns matter but concluded that any such documents "were proprietary records of the Reserve Bank, and not Board records subject to FOIA." (*Id.* ¶ 27.)

On September 30, 2008, the Board responded to the Bear Request by sending Bloomberg a denial letter, stating "Staff searched Board records and made suitable inquiries, but found no documents that are responsive to your request." (*Id.* ¶ 29, Ex. 7.) The denial letter also stated,

> Staff has confirmed that documents responsive to your request are located at the Federal Reserve Bank of New York. I have determined that these documents are not "records of the Board" under the Act. Nevertheless, even if they were deemed to be "records of the Board," I have confirmed that the documents would be exempt in full from disclosure under exemption 4 of the Act.

(*Id.* ¶ 29, Ex. 7.) On October 14, 2008, Bloomberg appealed the denial to the Board. On November 7, 2008, the Board responded to the appeal by sending Bloomberg a denial letter, stating,

> the [FRBNY] obtained the documents as part of its administration of a loan extended by the [FRBNY] to facilitate the acquisition of Bear Stearns by J.P. Morgan Chase & Co. (JPMC). Although the loan was made under emergency and other circumstances necessitating Board involvement, these circumstances did not convert an otherwise commercial action into a Board (agency) function. At no time did the Board or Board staff obtain, review, or rely upon these documents. Accordingly, I conclude that the documents

are not 'records of the Board' subject to the Act.

(*Id.* ¶ 29, Ex. 7.) The denial letter also reiterated that even if the documents at the FRBNY were considered records of the Board, the Board considered them exempt under Exemptions 4 and 5.

Bloomberg now sues the Board to force compliance with the FOIA Requests.

## II. *DISCUSSION*

### A. *Jurisdiction*

Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States. Also, this Court has jurisdiction to order injunctive relief against the Board pursuant to 5 U.S.C. § 552(a)(4)(B) because Bloomberg has its principal place of business in this district and the Board has improperly withheld agency records from Bloomberg, as explained more fully below.

### B. *Legal Standards*

When responding to a FOIA request, a federal agency must (1) conduct an adequate search using reasonable efforts, (2) provide the information requested, unless it falls within a FOIA Exemption, and (3) provide any information that can reasonably be segregated from the exempt information. 5 U.S.C. §§ 552(a)(3), 552(b). FOIA generally requires complete disclosure of requested agency information unless the information falls into one of FOIA's nine clearly delineated exemptions. 5 U.S.C. § 552(b); *see also Dep't of Air Force v. Rose*, 425 U.S. 352, 360–61, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976) (discussing the history and purpose of the FOIA and the structure of FOIA exemptions). In light of FOIA's goal of promoting a general philosophy of full agency disclosure, the exemptions are construed narrowly. *United States Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151, 109 S.Ct.

2841, 106 L.Ed.2d 112 (1989); *Associated Press v. United States Dep't of Defense*, 554 F.3d 274, 283–84 (2d Cir.2009).

██ As with all motions for summary judgment, summary judgment in a FOIA action should be granted only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is the preferred procedural vehicle for resolving FOIA disputes. *See Amnesty Int'l USA v. CIA*, 07 Civ. 5435, 2008 WL 2519908, at *8 (S.D.N.Y. June 19, 2008). "[T]he strong presumption in favor of disclosure places the burden on the agency to justify the withholding of any requested documents." *United States Dep't of State v. Ray*, 502 U.S. 164, 173, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991). First, the agency has the burden to show that it conducted an adequate search for responsive records. *Carney v. United States Dep't of Justice*, 19 F.3d 807, 812 (2d Cir.1994). A search will be considered adequate if it was reasonably calculated to uncover all relevant documents. Reasonableness does not demand perfection, and a reasonable search need not uncover every document extant. *Grand Cent. Partnership, Inc. v. Cuomo*, 166 F.3d 473, 489 (2d Cir.1999).

██ The agency's burden to show it conducted an adequate search may be satisfied by submitting affidavits or declarations "indicating that the agency has conducted a thorough search and giving reasonably detailed explanations why any withheld documents fall within an exemption." *Carney*, 19 F.3d at 812. "Affidavits submitted by an agency are accorded a presumption of good faith; accordingly, discovery relating to the agency's search

and the exemptions it claims for withholding records generally is unnecessary if the agency's submissions are adequate on their face." *Id.* (internal quotation marks and citation omitted). However, such declarations must be non-conclusory.[4] Once the agency satisfies its burden of showing that it conducted an adequate search, the burden shifts to the plaintiff to make a showing of bad faith sufficient to impugn the agency's showing. *Id.*; *see also Triestman v. United States Dep't of Justice*, 878 F.Supp. 667, 672 (S.D.N.Y. 1995).

██ An agency also bears the burden of showing that withheld responsive information falls within one of FOIA's nine exemptions. 5 U.S.C. § 552(a)(4)(B). "FOIA specifies that a district court must conduct *de novo* review of an agency's claims to exemptions," *Lee v. Fed. Deposit Ins. Corp.*, 923 F.Supp. 451, 453 (S.D.N.Y. 1996), which "are to be narrowly construed with all doubts resolved in favor of disclosure," *Grand Cent.*, 166 F.3d at 478 (internal quotation marks omitted). An agency must show with "reasonable specificity" that withheld information falls within a FOIA exemption; conclusory or speculative assertions in support of an exemption are insufficient. *Halpern v. F.B.I.*, 181 F.3d 279, 286, 293 (2d Cir.1999); *see also* Part II.E.i.b, *infra*, at p. 279 (discussing an agency's burden of showing that FOIA Exemption 4 applies). "[S]ummary judgment in favor of the FOIA plaintiff is appropriate [w]hen an agency seeks to protect material which, even on the agency's version of the facts, falls outside the proffered exemption.'" *New York Times Co. v. United States Dep't of Defense*, 499 F.Supp.2d 501, 509 (S.D.N.Y.2007) (internal quotation marks omitted). Finally, an agency may not withhold entire documents

4. "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e).

or broad categories of documents when only a segregable portion is exempt from disclosure. 5 U.S.C. § 552(b).

## C. Adequacy of the Board's Searches

Bloomberg does not contest the adequacy of the Board's search of its own records in response to the FOIA Requests. Rather, Bloomberg argues that by not searching any records at the FRBNY, the Board's search was inadequate because (i) Board regulations qualify certain records held at the FRBNY as agency records of the Board and (ii) the FRBNY was acting on behalf of the Board, thus qualifying all FRBNY records as constructively obtained and controlled by the Board. Additionally, Bloomberg contends that the FRBNY is itself an agency for FOIA purposes.

The Board concedes that the regulations qualify at least some records held at the FRBNY as agency records of the Board but interprets the regulations so narrowly that no records held at the FRBNY would be responsive to the FOIA Requests. Next, the Board disputes the application of Bloomberg's constructive obtainment and control theory. Finally, the Board argues that the question of whether the FRBNY is an agency for FOIA purposes is not relevant to this action and need not be decided.

As explained more fully below, the Board regulations specify that certain records kept at the FRBNY are agency records of the Board. Those records must be searched. Bloomberg's constructive obtainment and control theory is rejected. Finally, the Court agrees that the

FRBNY's status as an agency for FOIA purposes is irrelevant to the issue of the adequacy of the Board's search.

### (i) Board Regulations Establish that Certain Records at the FRBNY are Agency Records of the Board.

FOIA empowers district courts to order the production of (1) improperly (2) withheld (3) agency records, in response to a FOIA request. 5 U.S.C. § 552(a)(4)(B). Unless each of the three § 552(a)(4)(B) criteria are met, "a district court lacks jurisdiction to devise remedies to force an agency to comply with the FOIA's disclosure requirements." *Tax Analysts*, 492 U.S. at 142, 109 S.Ct. 2841; *see also Grand Cent.*, 166 F.3d at 478.

 The Board concedes that certain records at the FRBNY qualify as agency records of the Board. (*See* Board Br. at 40 ("By regulation, a very narrow category of documents located at the [FRBs] are 'Board Records' subject to FOIA.").) Thus, the central inquiry at this stage is to determine which records at the FRBNY qualify as agency records of the Board so as to be within the scope of records potentially responsive to the FOIA Requests. The Supreme Court has articulated a two-part test for determining what records constitute "agency records" for FOIA purposes: (1) records either created or obtained by the agency to which the FOIA request was made and (2) records under that agency's control at the time the FOIA request is made. *Tax Analysts*, 492 U.S. at 144–45, 109 S.Ct. 2841. Regulations promulgated by an agency may be helpful in determining what constitutes the agency's "agency records" for FOIA purposes.[5]

---

**5.** The parties have not brought to this Court's attention any authority explaining the extent to which an agency's FOIA regulations may impact the agency's statutorily imposed FOIA obligations. It seems beyond cavil that an agency may promulgate regulations expanding the scope of information that FOIA would otherwise define as the agency's "agency records." But because district courts are tasked with resolving FOIA controversies upon *de novo* review, determining the province of an agency's "agency records" falls ultimately to the courts. *See* 5 U.S.C. § 552(a)(4)(B).

Regulations promulgated by the Board, in order to comply with the Board's FOIA obligations (the "Regulations"),[6] state that the "Secretary of the Board [ ] is the official custodian of all *Board records, including records that are in the possession or control of* the Board, *any Federal Reserve Bank,* or any Board or Reserve Bank employee." 12 C.F.R. § 261.3(a) (emphasis added). The plain language definition of "custodian" is "one that guards and protects or maintains." Webster's Third New International Dictionary Unabridged (2009); *see also* Oxford English Dictionary (2009) ("One who has the custody of a thing."). Thus, according to the plain language of its own Regulations, the Board, by way of the Secretary of the Board, obtains and controls records in the possession or control of the FRBs, and those records qualify as "agency records" for purposes of FOIA requests addressed to the Board.

However, not *all* records at the FRBs are within the custody of the Secretary of the Board because the Regulations elsewhere limit the scope of "Board records," as used in § 261.3(a), to a subset of documents in the possession or control of the FRBs. The Regulations use the terms "Board records" and "Records of the Board" interchangeably, thus the Court looks to the definition of "Records of the Board" for purposes of defining Board records. "Records of the Board" are defined as:

> (i) In written form, or in nonwritten or machinereadable form; *all information coming into the possession and under the control of* the Board, any Board member, *any Federal Reserve Bank,* or any officer, employee, or agent of the

Board or of any Federal Reserve Bank, *in the performance of functions for or on behalf of the Board* that *constitute part of the Board's official files;* or
> (ii) That are *maintained for administrative reasons in the regular course of business in official files in* any division or office of the Board or *any Federal Reserve Bank in connection with the transaction of any official business.*

12 C.F.R. § 261.2(i)(1) (emphasis added).

Although hardly a model of grammatical clarity, § 261.2(i)(1) certainly establishes criteria for determining which records at FRBs qualify as Records of the Board— *viz.,* records (1) constituting a part of the Board's official files and (2) maintained in the performance of functions for or on behalf of the Board (§ 261.2(i)(1)(i)), *or* records (1) maintained for administrative reasons, (2) in the regular course of business, (3) in the Board's official files, and (4) in connection with the transaction of any official business (§ 261.2(i)(1)(ii)). "[O]fficial files," as used in §§ 261.2(i)(1)(i) and 261.2(i)(1)(ii), is defined as "the Board's central records." 12 C.F.R. § 261.2(a).

In this action, instead of focusing on the "official files" criterion, the parties spar over the "for or on behalf of the Board" criterion. The Board contends that "for or on behalf of" actually means "under delegated authority from the Board." (Board Br. at 41–46 & n. 13; Board Reply Br. at 8; Supp. Thro Decl. ¶¶ 3–5.) Bloomberg disagrees and contends that the Board's idiosyncratic interpretation should not be adopted. Ultimately, this disagreement need not be resolved because if a record is kept in *the Board's official files* at a FRB, the Secretary of the Board is its official custodian, regardless of its subject matter, and thus it qualifies as a Board "agency record." *See* 12 C.F.R. § 261.3(a).[7]

---

6. *See* 12 C.F.R. § 261.1(c)(2) ("[T]his [sub-]part implements the Freedom of Information Act (FOIA).").

7. While of course the Court strives to attach significance to each 12 C.F.R. § 261.2(i)(1) criterion, a plain language interpretation of § 261.2(i)(1) leads to the only logical conclusion that so long as a record is maintained in

The Board has not conducted an adequate search of its agency records because the Board did not search *any* FRBNY records. In other words, the Board improperly withheld agency records in response to a FOIA request by conducting an inadequate search. 5 U.S.C. § 552(a)(4)(B). The Board shall search forthwith records at the FRBNY that constitute "Records of the Board" within the meaning of 12 C.F.R. § 261.2(i)(1). So long as records at the FRBNY satisfy the plain language meaning of § 261.2(i)(1), they qualify as agency records of the Board and are subject to FOIA requests. The parties shall confer following their review of the results of the search and inform the Court by letter no later than September 14, 2009 how they propose to proceed.

*(ii) Constructive Obtainment and Control Theory*

 Bloomberg also argues that *all* FRBNY records are agency records of the Board because "[i]f a government contractor performs a task on behalf of the government, the records relating to the task are 'agency records.'" (Bloomberg Br. at 17 n. 9.) Bloomberg includes this argument in the section of its Memorandum titled "Reserve Banks Are Agencies And Therefore Their Records Are Subject To FOIA" but apparently assumes, for the sake of this argument, that the FRBNY is a "private party." *Id.* Thus, for purposes of this argument, this Court assumes that the FRBNY is not an agency. For a more complete discussion of that issue, see Part II.D, *infra*, at page 276 and especially note 11.

Bloomberg cites *Burka v. United States Dep't of Health and Human Servs.*, 87 F.3d 508, 515 (D.C.Cir.1996), and *In Defense of Animals v. Nat'l Inst. of Health*, 543 F.Supp.2d 70, 77 (D.D.C.2008), which it contends recognized a constructive obtainment and control theory for purposes of classifying agency records under FOIA.[8] Briefly, the theory is rooted in the notion that an agency may exercise such supervision or control over another entity that the entity's records constructively become the agency's records, irrespective of whether the agency actually obtained or availed itself of the records. *Burka*, 87 F.3d at 515. The theory incorporates a four-factor analysis: "(1) the intent of the document's creator to retain or relinquish control over the records; (2) the ability of the agency to use and dispose of the record as it sees fit; (3) the extent to which agency personnel have read or relied upon the document; and (4) the degree to which the document was integrated into the agency's record system or files." *Id.* (internal quotation marks omitted). Bloomberg also states, without supporting authority, that "Congress never intended to allow government agencies to arbitrarily keep their decisions and actions secret by outsourcing government business." (Bloomberg Br. at 17–18 n. 9.)

While Bloomberg implies that FOIA compels the acceptance of the constructive obtainment and control theory and that the theory is consistent with the Supreme Court's two-part agency records test, as set forth in *Tax Analysts*, 492 U.S. at 144–45, 109 S.Ct. 2841, Bloomberg cites no decisions from this Circuit applying the

---

Board official files, *anywhere*, the purpose or subject matter of that record is immaterial for purposes of qualifying it as a Board record.

**8.** Although not cited by Bloomberg, the Court notes that the Northern District of Illinois has also considered *Burka* and applied a construc-

tive creation and control theory. *See Chicago Tribune Co. v. United States Dep't of Health and Human Servs.*, No. 95 C 3917, 1997 WL 1137641, at *13 (N.D.Ill. March 28, 1997). This Court considered that decision in reviewing Bloomberg's arguments.

*Burka* theory. *Tax Analysts* teaches that agency records are (1) records either created or obtained by the agency to which the FOIA request was made and (2) records under that agency's control at the time of the FOIA request. The obtainment prong includes a broad swath of materials because "agencies routinely avail themselves of studies, trade journal reports, and other materials produced outside the agencies both by private and governmental organizations." *Id.* at 144, 109 S.Ct. 2841. While the Supreme Court has declined to "categorize what agency conduct is necessary to support a finding that [the agency] has 'obtained' documents," it has determined that an agency's right to obtain another entity's documents and an agency's mere supervision over a federally-funded entity are insufficient findings to satisfy the obtainment prong of the test. *Forsham v. Harris,* 445 U.S. 169, 186 & n. 17, 100 S.Ct. 977, 63 L.Ed.2d 293 (1980). Rather, "FOIA applies to records which have been *in fact* obtained." *Id.* at 185–6, 100 S.Ct. 977 (emphasis in original).[9] As to the control prong of the test, the Supreme Court held, "[b]y control we mean that the materials have come into the agency's *possession* in the legitimate conduct of its official duties." *Tax Analysts,* 492 U.S. at 145, 109 S.Ct. 2841 (emphasis added). That is not to say that mere physical presence within an agency is insufficient to qualify a record as an agency record, *see Kissinger v. Reporters Comm. for Freedom of the Press,* 445 U.S. 136,

157, 100 S.Ct. 960, 63 L.Ed.2d 267 (1980), but possession is certainly a prerequisite.

*Burka,* on the other hand, involved an instance where the responding agency never had possession or availed itself of an entity's records, yet the court qualified them as agency records for FOIA purposes. Specifically, the court held that data tapes created and possessed by a nonagency government contractor qualified as agency records because the contractor "acted on behalf of [the responding agency] in creating the tapes," evidenced by "the extensive supervision and control exercised by the agency over collection and analysis." 87 F.3d at 515. The court concluded that the agency had "constructive control" of the data tapes. *Id.*[10]

The Supreme Court's teachings in *Tax Analysts, Forsham,* and *Kissinger* certainly do not compel adoption of the constructive obtainment and control theory, and thus this Court declines to do so under the facts presented here. Accordingly, this Court rejects the theory that all records in the possession or control of the FRBNY qualify as agency records of the Board merely because the FRBNY may have acted on the Board's behalf. As described above, the Board shall search only those records in the possession or control of the FRBNY that qualify as Board records pursuant to Board Regulations. *See* Part II.C.i, *supra.*

9. It must also be noted that the Supreme Court has said, "[r]ecords of a nonagency certainly could become records of an agency as well," but the Supreme Court provides little guidance for determining when and how this might occur. *See Forsham,* 445 U.S. at 181, 100 S.Ct. 977; *see also Tax Analysts,* 492 U.S. at 144, 109 S.Ct. 2841 (quoting *Forsham* ).

10. Bloomberg also contends that *NIH* embraces the constructive creation and control

theory. But that case involved different factual circumstances from *Burka.* There, the responding agency actually owned the facilities where the requested records were stored and the agency hired a contractor to create and maintain records concerning studies on chimpanzees owned by the agency. *NIH,* 543 F.Supp.2d at 77. Thus, while *NIH* purportedly relied on *Burka,* the constructive creation and control theory was only of marginal significance in that decision. *Id.*

## D. The FRBNY as FOIA Agency

Bloomberg also raises the question of whether the FRBNY is an agency for FOIA purposes. (Bloomberg Br. at 17–19; Bloomberg Supp. Br. 1–5.) The Board, on the other hand, adamantly maintains that that question is not relevant and need not be decided. (Board Reply. Br. at 9; Board Supp. Br. at 1.) Bloomberg contends that the question is relevant because "the [FRBNY] is an agency and has not promulgated its own FOIA regulations, [thus] those documents [at the FRBNY] are accessible through requests to the Board." (Bloomberg Reply Br. at 3.)

Bloomberg's logic is flawed. Bloomberg does not explain how the FRBNY's status as a FOIA agency implicates the Board's search of its agency records. FOIA imposes on each federal agency an obligation to search only its own agency records. 5 U.S.C. § 552(a)(3)(A). Bloomberg did not serve a FOIA request on the FRBNY. And Bloomberg does not contend that the FRBNY and the Board are actually one-and-the-same agency. As such, this Court agrees with the Board; Bloomberg's argument that the FRBNY is an agency for FOIA purposes has no bearing on the issue of the adequacy of the Board's search of its own agency records.

On the other hand, it seems that the question of the FRBs' status as agencies is indeed relevant to the applicability of the two FOIA exemptions invoked by the Board in this action. *See* pp. 277 n. 12 (in the context of Exemption 4), 281 (in the context of Exemption 5), *infra.* Nevertheless, as explained more fully below, an-

swering that question is ultimately not necessary to determine this action.[11]

## E. The Remaining Term Reports were Improperly Withheld Under FOIA Exemptions 4 and 5.

As noted above, in its December 9, 2008 Letter and *Vaughn* Index, the Board informed Bloomberg that it had located documents (the Remaining Term Reports) responsive to the Loan Request but that those documents were being withheld pursuant to FOIA Exemptions 4 and 5. Bloomberg contends that the Remaining Term Reports were improperly withheld because FOIA Exemptions 4 and 5 do not apply. Specifically, Bloomberg argues that invocation of Exemption 4 fails because the Board cannot meet its burden of showing that it obtained the Remaining Term Reports from a person or that their disclosure would cause substantial competitive harm to Federal Reserve System borrowers. Bloomberg argues that invocation of Exemption 5 fails because the Board has pointed to no recognized privilege in civil discovery that would protect the Remaining Term Reports from disclosure. The Board contends, not surprisingly, that the Remaining Term Reports were properly withheld under FOIA Exemptions 4 and 5. As explained below, neither exemption applies to the Remaining Term Reports, and they shall be produced.

### (i) FOIA Exemption 4

For Exemption 4 to apply, the withheld record must (1) contain information that is

---

11. In some instances, in order to reach a dispositive issue, it may be appropriate to assume that the FRBs are agencies. Other Courts in this district have assumed, without deciding, that FRBs are agencies in order to evaluate the enforceability of a FOIA request. *See, e.g., Sibille v. Federal Reserve Bank of New York,* 770 F.Supp. 134, 137–38 (S.D.N.Y. 1991) (assuming that the FRBNY is an agency but determining that an FRBNY's employee's logs were not used by the agency and thus were not within the scope of the FRBNY's agency records). However, it is inappropriate to assume without deciding that a FRB is an agency if the applicability of a FOIA exemption necessarily depends on a determination of that question. *See, e.g.,* n. 12, *infra.*

a "trade secret" or "commercial or financial" in character, (2) be "obtained from a person," and (3) be "privileged or confidential." 5 U.S.C. § 552(b)(4); *see also Inner City Press/Community on the Move v. Board of Governors of the Federal Reserve System,* 463 F.3d 239, 244 (2d Cir.2006). The parties here concede that the Remaining Term Reports qualify as commercial and financial in character. The parties disagree over whether the Remaining Term Reports were obtained from a person and whether they are privileged or confidential. The Remaining Term Reports do not satisfy either requirement.

*(a) Exemption 4: Obtained from a "Person" Requirement*

■■■ The Board contends that the FRBNY obtained the information contained in the Remaining Term Reports from the borrowers, who unquestionably qualify as "people" for FOIA purposes. (Board Br. at 16.) [12] The parties have not brought to the Court's attention any standard, other than one based on plain language meaning, for determining when information is obtained from a person. As such, applying the plain language meaning of obtain,[13] the Court disagrees with the Board's characterization of the information as "obtained from" the borrowers.

The only information in the Remaining Term Reports that the FRBNY and other FRBs could possibly have obtained from the borrows is the borrowers' names; the FRBs generated all the other information from internal data regarding their lending programs. It is evident from the Board's own testimony that the bulk of the information contained in the Remaining Term Reports was generated by the FRBNY and other FRBs operating DW programs. When borrowers applied to the FRBs for loans, the borrowers provided certain financial information including, *inter alia,* identification information, pledged collateral, and requested loan amounts. However, none of this information is contained in the Remaining Term Reports, other than borrower names. Rather, the Remaining Term Reports describe the originating FRB districts of the loans, individual loan amounts extended by the FRBs, the types of FRB lending program borrowed from, and loan origination and maturity dates. (Thro Decl. ¶¶ 11, 13; Board's Local Rule 56.1 Stmt. ¶ 5.) The FRBNY and FRBs generated this information from statistics they kept concerning the DW, TAF, PDCF and TSLF lending programs. For DW loans, "Reserve Bank staff would review the request, verify collateral and, if approved, enter the loan in the Reserve Bank's loan and accounting systems." (*See* Decl. of Brian F. Madigan ¶ 11.) For

---

12. The Board also suggests that it obtained the information contained in the Remaining Term Reports from a person because the Board obtained the information from the FRBNY and the FRBNY qualifies as a person. (Board Br. at 16.) But the only way the FRBNY could qualify as a person is if this Court determined that the FRBNY does not qualify as an agency because FOIA defines "person" as an "individual, partnership, corporation, association, or public or private organization *other than an agency.*" 5 U.S.C. § 551(2) (emphasis added). The Board has adamantly maintained throughout the course of this action that the question of whether the FRBNY is an agency is not relevant and need

not be decided. (Board Reply Br. at 9; Board Supp. Br. at 1.) Thus, in light of this inconsistency, the Court cannot help but conclude that the Board intended to abandon its argument that it obtained the information contained in the Remaining Term Reports from a person because it obtained the information from the FRBNY.

13. *See* Oxford English Dictionary (2009) ("To come into the possession of; to procure; to get, acquire, or secure."); Webster's Third New International Dictionary Unabridged (2009) ("[T]o gain or attain possession or disposal of usually by some planned action or method.").

PDCF and TSLF loans, the Board determined the maximum amount of funds to be provided, and the FRBNY then administered auction mechanisms to determine the actual loan amounts and terms. (*See id.* ¶ 8, 10.)

The fact that the FRBs themselves generated the information contained in the Remaining Term Reports is sufficient to vitiate the applicability of Exemption 4 with respect to that information. *Cf. Buffalo Evening News, Inc. v. Small Bus. Admin.*, 666 F.Supp. 467, 469 (W.D.N.Y. 1987) ("I find that all of the information sought by plaintiff here has been generated by the defendant SBA in the course of its involvement with its borrowers.... [T]his information in no way implicates any of the financial information provided by the borrowers to the government.").[14] The information in the Remaining Term Reports relates more to the FRBNY's decisions to lend than to the information provided by the borrowers. While the Remaining Term Reports certainly include information about the FRBs' interactions with the borrowers, it is a *non sequitur* to say that information *about* a person is obtained *from* that person.

The Board has not met its burden of showing that the information, other than the borrowers' names, in the Remaining Term Reports was obtained from a person and, indeed, has raised no material issue of fact. But, as explained below, the information constituting borrowers' names-and, for that matter, *all* the information contained in the Remaining Term Reports—is

not confidential, and thus falls outside the scope of Exemption 4.

*(b) Exemption 4: "Privileged or Confidential" requirement*

 As to the third Exemption 4 requirement, the Board contends that the information contained in the Remaining Term Reports is confidential. (Board Br. at 18–23.) Bloomberg contends that it is not. (Bloomberg Br. at 21–35.) In *Continental Stock Transfer & Trust Co. v. S.E.C.*, 566 F.2d 373, 375 (2d Cir.1977), the Court of Appeals adopted a two-part test, formulated by the District of Columbia Court of Appeals, in *National Parks & Conservation Association v. Morton*, 498 F.2d 765 (D.C.Cir.1974), for determining whether information is confidential for purposes of Exemption 4. "The test states that information is confidential for the purposes of Exemption 4 if its disclosure would have the effect either: '(1) of impairing the government's ability to obtain information—necessary information—in the future, or (2) of causing substantial harm to the competitive position of the person from whom the information was obtained.'" *Inner City Press*, 463 F.3d at 244 (quoting *Cont'l Stock*, 566 F.2d at 375). The Board has not argued that disclosure of the Reports will affect its ability to obtain necessary information in the future. (*See* Board Br. at 15–30.) Instead, the Board contends that disclosure will cause substantial harm to the competitive position of Federal Reserve System borrowers. Accordingly, only that part of the test will be considered.[15]

---

**14.** The Board incorrectly characterizes the holding of *Buffalo Evening News* as dependant on the fact that the SBA borrowers' names were publicly available prior to the FOIA request in that action. (Board Reply Br. at 15.) *Buffalo Evening News* states clearly that the agency's act of generating information was the motivating factor in the decision; it does not discuss the significance of the fact that the names were publicly available. 666

F.Supp. at 469. In any event, the Board does not explain how the availability of information in the public domain has any bearing on whether an agency obtained that information from a person. The two concepts are not mutually exclusive.

**15.** Some courts have recognized a third governmental interest that may qualify information as confidential for purposes of Ex-

■ Because the Court of Appeals has imported the *National Parks* confidentiality test from the D.C. Circuit, consulting the D.C. Circuit's burden standard in this regard is appropriate. An agency must point to specific evidence substantiating an assertion that release of a record would cause substantial competitive harm to the person from whom the information was obtained. *See Public Citizen Health Research Group v. F.D.A.*, 704 F.2d 1280, 1291 (D.C.Cir.1983) ("Conclusory and generalized allegations of substantial competitive harm, of course, are unacceptable and cannot support an agency's decision to withhold requested documents."). The agency must provide evidence that if the requested information is disclosed, competitive harm would be "imminent." *Iglesias v. C.I.A.*, 525 F.Supp. 547, 559 (D.D.C. 1981). And the specific evidence must show that the competitive harm will result from the affirmative use of the information by competitors of the person from whom the information was obtained, not merely injuries to that person's competitive position in the marketplace or "embarrassing publicity attendant upon public revelations." *Public Citizen*, 704 F.2d at 1291 n. 30.

The Board has not met its burden of proving that disclosure of the information contained in the Remaining Term Reports will cause substantial harm to the competitive position of the borrowers and has failed to raise an issue of fact. The Board submits affidavits from Board employees describing how borrowers may be stigmatized if their utilization of the Federal Reserve lending programs is disclosed. For example, Brian F. Madigan, Director of the MA and an economist, posits that,

> I have observed that depository institutions that may potentially borrow at the DW recognize that their customers, lenders and other counterparties, market analysts, and news media organizations, among others, may draw adverse inferences from their decision to borrow from the Federal Reserve Banks. This stigma ... can quickly place an institution *in a weakened condition vis-a-vis its competitors* by causing a loss of public confidence in the institution, a sudden outflow of deposits (a "run"), a loss of confidence by market analysts, a drop in the institution's stock price, and a withdrawal of market sources of liquidity.

(Decl. of Brian F. Madigan ¶ 17 (emphasis added); *see also* Decl. of Susan E. McLaughlin ¶¶ 20–22 ("If the name of an institution that borrowed from the [DW] were to be made public, there is a real

---

emption 4, referred to as the "program effectiveness" test, and the Board urges this Court to apply it in this action. (*See* Board Br. at 17, 23–30.) The program effectiveness test is derived from a footnote in *National Parks* that "express[ed] no opinion as to whether other governmental interests are embodied in [Exemption 4]," such as "program effectiveness." *See National Parks*, 498 F.2d at 770 n. 17. In adopting the *National Parks* formulation of Exemption 4, the Court of Appeals has explicitly stated that its "adoption did not encompass the speculation regarding 'program effectiveness' in footnote 17 of *National Parks*." *Nadler v. F.D.I.C.*, 92 F.3d 93, 96 & n. 2 (2d Cir. 1996). Nevertheless, at least one district court in this Circuit has imported the pro-

gram effectiveness test. *See, e.g., Fox News Network, LLC v. Board of Governors of The Federal Reserve System*, 639 F.Supp.2d 384, 400–402 (S.D.N.Y. July 30, 2009). *See also Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 879 (D.C.Cir.1992); *9 to 5 Org. for Women Office Workers v. Board of Governors of the Federal Reserve System*, 721 F.2d 1, 10 (1st Cir.1983).

In light of the strong presumption in favor of interpreting FOIA exemptions *narrowly*, not to mention the Court of Appeals's guidance that the program effectiveness test constitutes "speculation," *Nadler*, 92 F.3d at 96 n. 2, this Court will not import or apply the program effectiveness test in this action.

concern that market participants, including financial analysts, customers, and competitors of the borrowing institution, would draw adverse conclusions about the borrowing depository institution that were based on conjecture and speculation.").)

■ These affidavits are insufficient to carry the Board's burden of showing that disclosure of the Remaining Term Reports will cause the borrowers to suffer imminent competitive harm from the affirmative use of the disclosed information *by their competitors* or to raise an issue of fact on this question. In fact, they say *nothing* about how borrowers' competitors will affirmatively use the information that the borrowers participated in the Federal Reserve lending programs. At best, the proffered affidavits suggest that the borrowers' competitors may use the knowledge that a borrower participated in a Federal Reserve lending program in order to determine when the borrower is "in a weakened condition" and spread that information to the borrowers' shareholders or the market in general. But the risk of looking weak to competitors and shareholders is an inherent risk of market participation; information tending to increase that risk does not make the information privileged or confidential under Exemption 4. The Board would seemingly sweep within the scope of Exemption 4 all information about borrowers that anyone throughout the entire marketplace might consider to be *negative.* The Exemption cannot withstand such inflation.[16]

Nor does the Board point to an immediate risk of competitive harm that will result from disclosure of the Remaining Term Reports. The Board essentially speculates on how a borrower *might* enter a downward spiral of financial instability if its participation in the Federal Reserve lending programs were to be disclosed. (*See, e.g.,* Decl. of Brian F. Madigan ¶ 20 (the borrower "could be forced to pay very high rates to borrow and might be limited in its ability to issue longer-term debt").) Conjecture, without evidence of imminent harm, simply fails to meet the Board's burden of showing that Exemption 4 applies. Accordingly, I find that the Board improperly invoked Exemption 4 with respect to all the information in the Remaining Term Reports.

### (ii) FOIA Exemption 5

■ Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The Board contends that "there can be little doubt that the Remaining Term Reports are 'inter-agency or intra-agency memorandums or letters,' under 5 U.S.C. § 552(b)(5) as they are prepared by Board staff using data supplied by the [FRBs] and distributed to Board staff (with copies to the FRBNY) for use in formulating monetary policy and for Reserve Bank supervision purposes." (Board Br. at 32.) In light of this statement, the Board's position with respect to the status of the FRBs is unclear. The Board's position in this context impliedly concedes that the FRBs are agencies, thus satisfying the inter-agency memorandums requirement of Exemption 5, but the Board has also maintained throughout the course of this action that the issue of whether the FRBs are agencies is irrelevant (and in supplemental briefing requested by the Court,

---

16. Additionally, the Court finds that the Board's implied "understanding" with borrowers that certain information will remain secret constitutes insufficient evidence to show that the borrowers will suffer competitive harm. An agency's promise that information will remain confidential certainly does not, *ipse dixit,* make it so for purposes of Exemption 4.

the Board has even argued that the FRBs are *not* agencies). In the end, resolution of this quandary is not necessary to determine the applicability of Exemption 5 to the Remaining Term Reports because Bloomberg does not dispute that the Remaining Term Reports qualify as inter-agency or intra-agency memorandums. (Bloomberg Br. at 38–39; Bloomberg Reply Br. at 8.)

The parties disagree primarily over whether the Remaining Term Reports would or would not "be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The Supreme Court has interpreted this requirement to mean that Exemption 5 "simply incorporates civil discovery privileges." *United States v. Weber Aircraft Corp.*, 465 U.S. 792, 799, 104 S.Ct. 1488, 79 L.Ed.2d 814 (1984) (recognizing incorporation of the so-called "*Machin* [*v. Zuckert*, 316 F.2d 336 (D.C.Cir.1963) ] privilege"); *see also F.T.C. v. Grolier, Inc.*, 462 U.S. 19, 26–27, 103 S.Ct. 2209, 76 L.Ed.2d 387 (1983) (recognizing incorporation of the work product privilege); *Fed. Open Mkt. Comm. of the Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 354, 99 S.Ct. 2800, 61 L.Ed.2d 587 (1979) (recognizing incorporation of a quasi-confidential commercial information privilege); *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 152–154, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975) (recognizing incorporation of the pre-decisional deliberative process privilege and attorney work product privilege).

The Board contends that the Remaining Term Reports would be privileged in civil discovery under the privilege recognized in *Merrill*. The Board contends that Merrill recognized "a privilege analogous to the qualified privilege for confidential commercial information available in civil discovery under Fed.R.Civ.P. 26(c)(7)." (Board Br. at 31.) The Board's reading of *Merrill* in this regard is correct; *Merrill* indeed adapted a privilege from the then-extant Federal Rule Civil Procedure 26(c)(7). However, seizing on *Merrill*'s dicta, the Board also suggests that Exemption 5 protects " 'sensitive information not otherwise available ... immediate release of [which] ... would significantly harm the Government's monetary functions or commercial interests ....' " (Board Reply Br. at 23 (quoting *Merrill*, 443 U.S. at 363, 99 S.Ct. 2800); *see also* Board Br. at 31, 33.) The Board is mistaken; *Merrill*'s holding was not so broad.

*Merrill* considered whether FOIA Exemption 5 allowed the FOMC to withhold Domestic Policy Directives, monthly statements of policy from the FOMC to a senior account manager at the FRBNY indicating the FOMC's tolerance ranges for growth in the money supply and the federal funds rate. 443 U.S. at 344–45, 99 S.Ct. 2800. The *Merrill* Court "conclude[d] that Exemption 5 incorporates a qualified privilege for confidential commercial information, at least to the extent that this information is generated by the Government itself in the process leading up to awarding a contract." *Id.* at 360, 99 S.Ct. 2800. The Supreme Court then determined, by way of a concededly *inexact analogy*, that the FOMC Domestic Policy Directives may well fall within the scope of Exemption 5 because they were similar to confidential commercial information generated by the Government in the process leading up to awarding a contract. *Id.* at 361, 99 S.Ct. 2800. Ultimately, however, the Court left the determination of whether the FOMC Domestic Policy Directives actually fell within the scope of Exemption 4 for the district court. *Id.* at 364, 99 S.Ct. 2800.

The *Merrill* Court certainly did not intend to create a sweeping new privilege for any sensitive information, the immediate release of which would significantly harm the Government's monetary functions or

commercial interests. *Merrill* does not support such a reading, and that purported privilege is not incorporated into Exemption 5. *See id.* at 362, 99 S.Ct. 2800 (" '[T]here is no absolute privilege for trade secrets and similar confidential information.' ") (quoting 8 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2043 (1970)). Other Courts have recognized the limited nature of *Merrill*'s holding. *See, e.g., Shermco Indus., Inc. v. Sec'y of the Air Force,* 613 F.2d 1314, 1319 n. 11 (5th Cir.1980); *Anderson v. Dep't of Health and Human Servs.,* 907 F.2d 936, 945–946 (10th Cir.1990).

Nor would analogizing the Remaining Term Reports to confidential commercial information generated by the Government in the process leading up to awarding a contract be fruitful for the Board in this action. The Remaining Term Reports consist of aggregate information about participants in the FRBs' lending programs. And while the Remaining Term Reports were circulated to Board and FRBNY staff, the Reports do not contain any information remotely similar to the type of information discussed in *Merrill*: information that provides guidance or directives. Instead, they provide historic data.

Accordingly, the Board has not met its burden of showing that the Remaining Term Reports would not be available by law to a party other than an agency in litigation with the agency. As such, Exemption 5 does not permit the Board to withhold the Remaining Term Reports.[17]

## III. *CONCLUSION*

For the reasons set forth herein, the Board's Motion for Summary Judgment [dkt. no. 10] is DENIED, and Bloomberg's

Motion for Summary Judgment [dkt. no. 18] is GRANTED. Specifically,

1. The Board shall produce forthwith the Remaining Term Reports within five business days of the date hereof;

2. The Board shall search forthwith records at the FRBNY that constitute "Records of the Board" within the meaning of 12 C.F.R. § 261.2(i)(1); and

3. The parties shall confer following their review of the results of the search and inform the Court by letter no later than September 14, 2009 how they propose to proceed.

SO ORDERED.

---

**17.** Finally, the Board cites no authority from this Circuit supporting its theory that Exemption 5 "protects the government when it enters the marketplace as an ordinary buyer or seller." (Board Br. at 32 (internal quotation marks omitted).) Accordingly, that theory is rejected.