**NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD, American Civil Liberties Union Foundation, Immigrant Defense Project, Post–Deportation Human Rights Project, and Rachel Rosenbloom, Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF HOMELAND SECURITY, United States Citizenship and Immigration Services, United States Customs and Border Protection, United States Immigration And Customs Enforcement, United States Department of Justice, United States Department of State, Defendants.**

No. 11 civ. 3235(JSR).

United States District Court,
S.D. New York.

Feb. 7, 2012.

Nancy Babette Morawetz, New York, NY, for Plaintiffs.

Patricia L. Buchanan, Shane Patrick Cargo, U.S. Attorney Office, New York, NY, for Defendants.

## OPINION AND ORDER

JED S. RAKOFF, District Judge.

"Trust everybody, but cut the cards," as the old saying goes.[1] When the Solicitor General of the United States makes a representation to the Supreme Court, trustworthiness is presumed. Here, however, plaintiffs seek to determine whether one such representation was accurate or whether, as it seems, the Government's lawyers were engaged in a bit of a shuffle.

Specifically, in 2009, in a brief addressed to the Supreme Court, the Office of the Solicitor General ("OSG") represented that, "[b]y policy and practice, the government accords aliens who were removed pending judicial review but then prevailed before the courts effective relief by, *inter alia*, facilitating the aliens' return to the United States by parole under 8 U.S.C. 1182(d)(5) if necessary, and according them the status they had at the time of removal." Brief for Respondent at 44, *Nken v. Holder*, 129 S.Ct. 1749 (2009) (No. 08–681), 2009 WL 45980 at *44. Although the OSG did not support this assertion with any citation, *id.*, the Supreme Court in *Nken*, in holding that deportation of an alien before the resolution of an appeal from her order of removal does not constitute irreparable injury, expressly relied on this representation, stating that, "those who prevail can be afforded effective relief by facilitation of their return, along with restoration of the immigration status they had upon removal. See Brief for Respondent 44." *Nken v. Holder*, 556 U.S. 418, 129 S.Ct. 1749, 1761, 173 L.Ed.2d 550 (2009).

To discover the factual basis for the OSG's representation and determine the

---

1. The source of the saying may be Peter Finley Dunne, the great Irish–American political commentator of the late nineteenth and early twentieth centuries. *See* Peter Finley Dunne, Mr. Dooley's Philosophy 254 (Harper & Bros. Publishers 1906) (1900) ("Thrust ivrybody—but cut th' ca-ards.").

details of the asserted policy, plaintiffs in this case filed a request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, with the Department of Justice ("DOJ"), Department of State ("DOS"), and Department of Homeland Security ("DHS"). In response to that request, the OSG produced a mostly-redacted four-page chain of emails between the attorneys who argued before the Supreme Court in *Nken* and other government officials. See Decl. of Patricia L. Buchanan dated October 28, 2011 Ex. B. The OSG sought to justify the wholesale redactions on the basis of three privileges embodied in 5 U.S.C. § 552(b)(5): the work-product privilege,[2] the attorney-client privilege, and the deliberative-process privilege.

On October 11, 2011, plaintiffs filed a motion for summary judgment, requesting that this Court order disclosure of the contents of the emails. On October 31, 2011, the Government cross moved for summary judgment, requesting that the Court uphold the assertions of privilege. Both parties consented to *in camera* review of the emails. *See* Government's Memorandum of Law dated October 28, 2011 at 25; Plaintiffs' Memorandum of Law in Reply to Government's Opposition dated November 9, 2011 at 10. Accordingly, the Court conducted such a review. Based on that review, and the parties' submissions and arguments, the Court hereby partially grants and partially denies the motions by ordering disclosure of the portions of the emails that contain factual statements concerning the aforementioned policy and practice.

"Summary judgment is the preferred procedural vehicle for resolving FOIA disputes." *Bloomberg L.P. v. Bd. of Governors of Federal Reserve Sys.*, 649 F.Supp.2d 262, 271 (S.D.N.Y.2009). Although a party requesting summary judgment must demonstrate that there is "no genuine dispute as to any material fact" and that she is "entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(a), here the essential facts are undisputed:[3]

On December 17, 2009, plaintiffs filed a FOIA request with the DOJ, the DHS, and the DOS seeking information about the factual basis for the representation made in *Nken, viz.*, that the Government has a policy and practice of facilitating deported aliens' return and restoring their prior immigration status if they successfully appeal their removal decisions. Plaintiffs' Rule 56.1 Statement of Uncontested Facts ¶ 13. The DOS did not produce any records in response to plaintiffs' request. *Id.* ¶ 22. The DOJ referred the request to the OSG, and on February 8, 2011, after some clarification by plaintiffs, the OSG informed plaintiffs that a search yielded only the four-page email chain at issue in this opinion. *Id.* ¶¶ 14–17. The OSG indicated that it would withhold those records under 5 U.S.C. § 552(b)(5). *Id.* The DOJ also referred plaintiffs' request to its Civil Division, which produced only two, here-irrelevant documents and a list of cases. *Id.* ¶ 20.

**2.** Some authorities state that work-product is technically not a "privilege," but instead a "doctrine," *see In re Qwest Commc'ns Int'l*, 450 F.3d 1179, 1184 n. 3 (10th Cir.2006), but the distinction is too obscure to warrant further discussion here.

**3.** The Government chose neither to controvert plaintiffs' Rule 56.1 Statement of Uncontested Facts nor to propound its own Rule 56.1 statement in support of its cross-motion. Instead, the Government submitted the Declaration of Patricia L. Buchanan dated October 28, 2011, which included two exhibits: a September 2008 Memorandum of Agreement ("MOA") between three components of the DHS and a copy of the Government's original disclosures concerning the four-page email chain at issue in this case.

The DHS referred plaintiffs' FOIA request to three of its divisions: Customs and Border Protection ("CBP"), Immigration and Customs Enforcement ("ICE"), and Citizenship and Immigration Services ("CIS"). *Id.* ¶ 23. CIS responded by referring plaintiffs to two forms used by individuals who have been deported or are inadmissible. *Id.* ¶ 24. Neither form contains any specific information for individuals whose removal orders are reversed. *Id.* ¶¶ 25–26. In response to further requests, on May 24, 2011, CIS wrote, "US-CIS does not have a specific policy, program and/or guidance memo regarding a process for aliens wrongfully removed/deported from the United States." *Id.* ¶ 28, Ex. L. CBP informed plaintiffs that it has no set procedure for facilitating return. *Id.* ¶ 33. CBP does not track cases referred for judicial action and has no method for identifying whether an alien has succeeded on appeal. *Id.* ¶ 35.

ICE identified 2,650 pages of responsive records, and plaintiffs agreed to receive 500 pages every two weeks. *Id.* ¶ 31. As of October 7, 2011, plaintiffs had received 1,000 pages. *Id.* ¶ 32. None of the records produced identifies a written policy. *Id.* ¶ 36. In some instances, significant public benefit parole is used to return aliens who have prevailed on appeal. *Id.* ¶ 38, Ex. Y. ICE records show that officials frequently do not know whom they should contact to facilitate return. *Id.* ¶ 39. In some situations where ICE used parole, agency employees still expressed confusion about how to physically return a deportee. *Id.* ¶ 42, Ex. X. For example, in one email from 2009, an undisclosed person writes, "How this is handled has alw [redacted] haphazard." *Id.* ¶ 44, Ex. X. Other records admit that the Government's use of parole would not restore the status that removed aliens had prior to their removal. *Id.* ¶ 48. ICE records do not contain any publicly accessible forms or instructions for individuals whose removal orders have been reversed or vacated. *Id.* ¶ 50.

On August 8, 2011, the Government directed plaintiffs' attention to a Memorandum of Agreement ("MOA") between CIS, ICE and CBP. *Id.* ¶ 45. As noted, *supra,* the MOA is also one of the two documents that the Government provided for this litigation. Decl. of Patricia L. Buchanan dated October 28, 2011, Ex. A (MOA). An Addendum to the MOA provides that:

ICE will adjudicate parole requests relating to aliens in removal proceedings or who have final orders, as well as aliens granted deferred action by ICE at any point after the commencement of removal proceedings, regardless of whether the alien is within or outside of the United States. Given the context of removal proceedings, it is anticipated that parole of such aliens would occur only in very rare circumstances.

*Id.* at 6. The MOA also notes that, under current practice, "DHS bureaus have generally construed 'humanitarian' paroles . . . as relating to urgent medical, family, and related needs and 'significant public benefit paroles [sic] . . . as limited to persons of law enforcement interest such as witnesses to judicial proceedings.' " *Id.* at 2.

■ Against this factual background, the Court turns to the issues of law. "Upon request, FOIA mandates disclosure of records held by a federal agency, see 5 U.S.C. § 552, unless the documents fall within enumerated exemptions, see § 552(b)." *Dep't of Interior v. Klamath Water Users Protective Ass'n,* 532 U.S. 1, 8, 121 S.Ct. 1060, 149 L.Ed.2d 87 (2001). Furthermore, FOIA specifically requires that agencies make available "those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register." 5

U.S.C. § 552(a)(2)(B). Nonetheless, FOIA, under 5 U.S.C. § 552(b)(5), exempts from production documents protected by the attorney-client, work-product, and deliberative-process privileges.[4] Whenever the Government invokes a FOIA exemption, it bears the burden of "establish[ing] its] right to withhold information from the public." *Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 861 (D.C.Cir. 1980).[5]

The plaintiffs argue that the facts set forth in their Rule 56.1 statement reveal (i) that confusion exists about how aliens who prevail on appeals from their removal orders may obtain effective relief, (ii) that no widely known procedures exist for restoring those aliens to the status they had before their removals, and (iii) that the public has neither knowledge of nor access to the policies and procedures to which the OSG referred in *Nken.* Thus, they claim that disclosure of the email chain at issue in this case will either clarify the policy for the public or reveal how the OSG mistakenly asserted that a policy existed when none, in fact, did. At oral argument, the Government conceded that it does not dispute that plaintiffs have a proper basis for making a FOIA request. *See* Transcript, 11/17/11, at 27:14–15. Rather, as noted above, the Government argues that the attorney-client, the work-product, and the deliberative-process privileges protect the entire contents of the four-page email chain from disclosure. The Court considers each of these privileges in turn, finding that none protects statements of fact in the email chain that relate to the representation the OSG made in *Nken.*

■ Turning first to the work-product privilege, this privilege protects an attorney's ability to "assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference." *Hickman v. Taylor,* 329 U.S. 495, 511, 67 S.Ct. 385, 91 L.Ed. 451 (1947). The privilege is now codified in Federal Rule of Civil Procedure 26(b)(3)(A), which states: "Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative...." The privilege often extends to "correspondence" such as the emails at issue here. *Hickman,* 329 U.S. at 511, 67 S.Ct. 385. Nonetheless, the work-product privilege "may be waived," and a litigant may "no more advance the work-product doctrine to sustain a unilateral testimonial use of work-product materials than he could elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination." *United States v. Nobles,* 422 U.S. 225, 239–40, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975).

■ Plaintiffs make two related arguments for overcoming the Government's assertion of work-product privilege. First, they argue that, because none of the other materials provided by the Government contain any evidence to support the OSG's representation in *Nken,* the email chain must contain the OSG's factual basis for that representation. As a result, plaintiffs conclude, the OSG's representation constituted "unilateral testimonial use" of the email chain, and *Nobles* prevents the Gov-

---

4. By enacting 5 U.S.C. § 552(b)(5), "Congress intended to incorporate into the FOIA all the normal civil discovery privileges." *Hopkins v. U.S. Dep't of Housing and Urban Dev.,* 929 F.2d 81, 84 (2d Cir.1991).

5. Similarly, where agencies claim that "nonexempt material is not reasonably segregable" from exempt material, they must provide a "detailed justification" for that claim. *Mead Data Central, Inc. v. U.S. Dep't of Air Force,* 566 F.2d 242, 261 (D.C.Cir.1977).

ernment from asserting the work-product privilege to shield that chain from disclosure. Second, plaintiffs argue that the "fairness doctrine," which prevents "selective disclosure during litigation of otherwise privileged information," requires the Government to disclose the email chain in order to "to prevent prejudice to [other] part[ies] and distortion of the judicial process." *In re von Bulow,* 828 F.2d 94, 101 (2d Cir.1987).[6] These arguments, however, apply only to the portions of the emails' contents that factually describe (or refute) the alleged policy or practice. The arguments have no relevance to the portions of the emails that describe mental impressions, litigation strategy, and other "core" work-product. It is clear to the Court, upon review of the emails, that they do contain, in part, such core work-product, *see* Decl. of Patricia L. Buchanan dated October 28, 2011 Ex. B (describing the emails' contents as "[c]onsultations among attorney [sic] . . . regarding draft of government's brief"), but that there are also factual recitations about existing practices that are independent of, and easily severable from, the core work-product. The Court will therefore limit its discussion to the question of whether these factual contents are protected from disclosure.

To protect even these factual contents of the email chain, the Government makes three arguments so far as work-product privilege is concerned. First, it argues that the OSG did not rely upon the email chain when it made its representation in *Nken.* The Government claims that, instead, the OSG relied on 8 U.S.C. § 1182(d)(5), which provides for the use of parole "for urgent humanitarian reasons or significant public benefit," and on the MOA between ICE, CBP, and CIS, which

provides that "ICE will adjudicate parole requests relating to aliens in removal proceedings or who have final orders . . . regardless of whether the alien is within or outside of the United States."

As described below, the emails themselves (reviewed by the Court *in camera*) refute this argument on their face. Independently, moreover, the argument is without basis. Neither § 1182(d)(5) nor the MOA provide a factual basis for the claim that the Government has a "policy and practice" of "facilitating [wrongly deported] aliens' return to the United States . . . and according them the status they had at the time of removal." The MOA only allocates responsibility for adjudicating parole requests to ICE, revealing nothing about the Government's purported use of such requests for the specific purpose of returning deportees who prevail on appeal. And the language of 8 U.S.C. § 1182(d)(5) suggests, if anything, that the statute does not serve the purpose of returning deportees. Specifically, the statute provides that the Attorney General may "parole" aliens "into the United States temporarily" and that "when the purposes of such parole shall . . . have been served the alien shall forthwith return or be returned to the custody from which he was paroled." 8 U.S.C. § 1182(d)(5)(A). Moreover, parole does not accord aliens the status they had at the time of removal. *See* 8 U.S.C. § 1182(d)(5)(A) (specifying that "parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall . . . have been served . . . [the alien's] case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States"). In short, neither 8 U.S.C. § 1182(d)(5)(A), nor the MOA, nor

---

**6.** *In re von Bulow* considered the attorney-client privilege rather than the work-product privilege. Nonetheless, selective disclosure of

materials that the work-product privilege protects can also distort the judicial process, as the holding in Nobles recognizes.

any other evidence here proffered by the Government supports the suggestion that the OSG's representation in *Nken* was based on anything other than the facts provided to the OSG in the email chain here at issue.

By contrast, the email chain (as reviewed by the Court *in camera*) evidences an attempt to cobble together a factual basis for making the representation the OSG made to the Court in *Nken*. This basis consisted of information obtained as to how various relevant agencies commonly handle the return of deportees who prevail on appeal and the restoration of their immigration status. Given the absence of public disclosure of these agencies' practices and the Government's assertion that it has adopted a policy, such assertions must amount to a statement of that policy.[7] Accordingly, the OSG's representation-which it made in a brief to this nation's highest court-constituted "unilateral testimonial use" of the email chain at issue in this case and is not protected by work-product privilege.

Second, the Government argues that, even if the OSG made "unilateral testimonial use" of the email chain, the rules of *Nobles* and *In re von Bulow* do not apply because, in each of those cases, litigants invoked privileged materials at trial, rather than on appeal. According to the Government, different procedural safeguards apply at trial and on appeal. Thus, the Government concludes, even if at trial plaintiffs might have been entitled to disclosure of the email chain, on appeal they must rely on reply briefs and pointed questioning at oral argument.

The Government, however, cites no authority in support of its distinction between the effect of "unilateral testimonial use" of privileged material at trial and on appeal, and the Court finds this purported distinction illusory. The Government wholly ignores the fact that, in *Nken*, unlike in most appeals, the OSG made a factual representation, unsupported by any citation to the record, and intended that the Court rely on it, which the Court did. In such circumstances, to claim that the procedural safeguards that attend unilateral use of a factual assertion do not apply is pure gamesmanship. Even on appeal, courts have every reason to subject the bases of parties' factual claims to some modest testing, before which any claim of work-product privilege must yield. A different approach would permit the very "distortion of the judicial process" that the fairness doctrine attempts to avoid. Indeed, in this very case, the plaintiffs have provided substantial evidence that the judicial process may have been impugned if the Supreme Court relied upon what may well have been inaccurate or distorted factual representation. Thus, the Court concludes, under *Nobles*, that the OSG's "unilateral testimonial use" on appeal of the substance of the facts set forth in the email chain renders inapplicable the Government's recourse to the work-product privilege.

Third, the Government argues that requiring disclosure of the email chain will vitiate the work-product privilege by allowing plaintiffs to routinely access government attorneys' correspondences whenever those correspondences might arguably contain relevant factual materials. This argument, however, completely ignores the highly uncommon circumstances of this case. In *Nken*, the OSG made a new

---

7. Thus, even if the work-product privilege applied here, FOIA would require disclosure of this information in some unprivileged form. *See* 5 U.S.C. § 552(a)(2)(B) (requiring that an agency make available "those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register").

factual representation on appeal and cited nothing in the record to support it.[8] Moreover, the Government even now has come forward with nothing of consequence to support its representation beyond the facts set forth in the emails. These highly unusual circumstances render the Government's "slippery slope" argument unavailing.

Turning next to attorney-client privilege, this privilege "protects confidential communications between client and counsel made for the purpose of obtaining or providing legal assistance.... Its purpose is to encourage attorneys and their clients to communicate fully and frankly...." *In re County of Erie*, 473 F.3d 413, 418 (2d Cir.2007) (citations omitted). "A party invoking the attorney-client privilege must show (1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." *Id.* at 419. As with work-product privilege, discussed above, a party can waive attorney-client privilege by making "a deliberate decision to disclose privileged materials in a forum where disclosure was voluntary and calculated to benefit the disclosing party." *In re Grand Jury Proceedings*, 219 F.3d 175, 184 (2d Cir.2000).

For the reasons described above, the OSG's "unilateral testimonial use" of the factual contents of the email chain constitutes "a deliberate decision to disclose privileged materials in a forum where disclosure was voluntary and calculated to

benefit the disclosing party." The OSG disclosed the existence of a purported policy the details of which do not appear to reside anywhere outside the email chain. Having chosen to assert the existence of a previously undisclosed policy, the OSG cannot now claim that the attorney-client privilege protects the factual details on which it relied when it made that assertion. *See In re Grand Jury Proceedings*, 219 F.3d at 182 ("[A] party cannot partially disclose privileged communications or affirmatively rely on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party.").[9] Accordingly, so far as the factual contents of the emails are concerned, the OSG waived any attorney-client privilege that may have attached.

Independently, moreover, the Court further finds that no attorney client privilege attached. As noted above, this privilege attaches only where information "was intended to be and was in fact kept confidential." FOIA specifically requires that agencies make available "those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register." 5 U.S.C. § 552(a)(2)(B). Under § 552(a)(2)(B), to the extent that the OSG's client agencies described an existing but otherwise unknown policy to the OSG, those agencies had a duty under FOIA to make statements of that policy publicly available. Thus, FOIA barred those agencies from intending to keep statements of

---

8. Importantly, the OSG did not cite 8 U.S.C. § 1182(d)(5) in support of its claim, but instead identified that statute as the procedural mechanism by which the Government implemented its alleged policy.

9. That the OSG did not explicitly cite the email chain does not mean that it did not

"affirmatively rely" on those emails. Otherwise, litigants would have perverse incentives to cite nothing in support of their most dubious factual claims, knowing that, while a court might rely on those claims, it could never scrutinize them because of attorney-client privilege.

their policy confidential. Concluding that attorney-client privilege applied would amount to a finding that the client agencies articulated a policy solely for the purposes of litigation. But, of course, agencies cannot limit the application of a policy to a particular case in which having such a policy would prove beneficial. Accordingly, attorney-client privilege did not attach to any factual descriptions of the policy asserted by the OSG in *Nken*.[10]

Turning finally to the deliberative-process privilege, this privilege has "a number of purposes:"

> it serves to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action.

*Coastal States Gas Corp.*, 617 F.2d at 866. "Manifestly, the ultimate purpose of this long-recognized privilege is to prevent injury to the quality of agency decisions." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975).

▬▬ While it follows from this that the privilege applies where an agency makes a decision about, for example, what policy to adopt, here the Government concedes that the email chain does not contain "deliberations about creating a new policy to return aliens." Government's Memorandum of Law dated October 28, 2011 at 24. Nonetheless, the Government argues that, because a statute commits to the OSG's discretion the decision of how to present the Government's arguments before the Supreme Court, *see* 28 U.S.C. § 518(a)("[T]he Solicitor General shall conduct and argue suits and appeals in the Supreme Court ....."), the OSG is somehow the relevant agency for application of the deliberative process privilege to the factual contents of the emails.

The Government cites no case in support of this novel construction of the deliberative-process privilege, and the Court declines to adopt it.[11] So construed, the deliberative-process privilege would wholly displace the work-product privilege, protecting the same materials without providing the same exceptions. Statutes commit the authority to litigate on the Government's behalf to many different parts of the DOJ. *See, e.g.*, 28 U.S.C. § 515(a) ("The Attorney General or any other officer of the Department of Justice, or any attorney specially appointed by the Attor-

---

**10.** Resisting this conclusion, the Government argues that "[f]actual information provided by the client to the attorney is the essence of the privilege." *Vento v. IRS*, 714 F.Supp.2d 137, 151 (D.D.C.2010). While attorney-client privilege certainly protects a client's private information, FOIA prohibits agencies from treating their policies as private information. Thus, attorney-client privilege simply does not apply to statements of policy, at least in the circumstances of this case.

**11.** Of course, the OSG's presentation of the Government's position to a court differs substantially from an offer of legal advice to an agency considering the legal implications of a proposed policy, to which he deliberative-process privilege would often apply. *See Brinton v. Dep't of State*, 636 F.2d 600, 604 (D.C.Cir. 1980). Nonetheless, the Government concedes that no agency considered adopting a new policy in the email chain, and thus the OSG could not have offered any legal advice on such a proposal.

ney General under law, may ... conduct any kind of legal proceeding, civil or criminal."); 28 U.S.C. § 519 ("[T]he Attorney General shall supervise all litigation to which the United States, an agency, or officer thereof is a party, and shall direct all United States attorneys, assistant United States attorneys, and special attorneys appointed under section 543 of this title in the discharge of their respective duties."). Surely an Assistant United States Attorney could not make "unilateral testimonial use" of attorney work-product at trial and then claim that the deliberative-process privilege protected that work-product— even though the work-product privilege did not—because 28 U.S.C. § 515(a) gave her and her superiors discretion to decide how to conduct the litigation. Such a result would mean that 5 U.S.C. § 552(b)(5), rather than preserving "normal" discovery privileges for the Government, in fact gave the Government more extensive privileges. Accordingly, the Court declines to adopt the Government's expansive construction of the deliberative-process privilege. Because the Government concedes that the email chain does not contain "deliberations about creating a new policy to return aliens," the Court finds that the deliberative-process privilege does not protect the email chain from disclosure.

In sum, the Court finds that, while the work-product privilege protects those parts of the email chain that do not contain factual descriptions of the policy to which the OSG referred in *Nken*, neither the work-product privilege, nor the attorney-client privilege, nor the deliberative-process privilege protects the parts of the email chain that do contain such factual descriptions. Moreover, the Court finds that the Government has not provided any justification, much less a "detailed justification," for finding that the non-exempt material in the email chain "is not reason-

ably segregable" from the exempt material. *Mead Data Central*, 566 F.2d at 261. Accordingly, the Court partially grants plaintiffs' motion for summary judgment and orders the Government to disclose the portions of the email chain that contain factual descriptions of the putative policy the existence of which the OSG asserted in *Nken*. Based on its *in camera* review of the email chain, the Court concludes that the following portions contain such descriptions:

(1) in the email sent Wednesday, December 31, 2008 at 5:13 PM, the first sentence of the first paragraph and the entire second paragraph;

(2) in the email sent Friday, January 2, 2009 at 2:13 PM, the entire second paragraph;

(3) in the email sent Monday, January 5, 2009 at 6:32 PM, the third and fourth sentences;

and (4) in the email sent Wednesday, January 7, 2009 at 12:29 PM, the second and third paragraphs.

Barring further applications, the Government is directed to disclose these portions to plaintiffs by no later than February 13, 2012. In the meantime, the Court will file under seal a complete copy of the entire email chain that it reviewed *in camera*. In all other respects, the plaintiffs' motion is denied and the Government's cross-motion is granted, and the Clerk of the Court is ordered to close documents number 14 and 20 on the docket of this case.

SO ORDERED.

## *MEMORANDUM ORDER*

Like a flatworm cut in half that returns

as two flatworms,[1] this case just gets curiouser and curiouser. Many months ago, in response to plaintiffs' request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, the Government identified a six-page chain of emails that it represented were the documents of the Office of the Solicitor General ("OSG") responsive to the request but as to which the Government claimed privilege. But no sooner had the Court issued its Opinion and Order of February 7, 2012 (full familiarity with which is here presumed) rejecting those claims of privilege than the Government identified, on February 16, 2012, an additional 16 pages of OSG emails responsive to the request, as to which it also claimed privilege. No explanation was offered for the failure to disclose these emails earlier, even though some of them were effectively part of the email chain previously disclosed. The Government did, however, submit to the Court unredacted copies of the new emails, so that the Court could evaluate the claims of privilege. (As in the case of the previously submitted emails, an unredacted copy of the newly-submitted emails will be filed under seal.) Additionally, the Government, having previously moved on February 9 for a 60–day stay of the Court's February 7 ruling so that the Government could decide whether or not to appeal that ruling, now requests that any such stay also apply to any portions of the new emails that the Court might order disclosed to plaintiffs.

Turning first to whether any portions of the new emails should be disclosed to plaintiffs, the Government concedes that the new emails are of the same kind as those on which the Court previously ruled.

Although some of the new emails were sent after the Government filed the Supreme Court brief in *Nken v. Holder* that made the representation about the Government's "policy and practice" in alien removal cases that is the subject of plaintiffs' FOIA request, those emails, prepared in anticipation of oral argument before the Supreme Court, reflect the OSG's further inquiries about the alleged policy and practice, and the Government does not dispute that they are within the scope of the FOIA request. Both sides agree, moreover, that the new emails do not present any claims of privilege different in any relevant respect from those previously considered by the Court.

Applying to the new emails, therefore, the same legal principles set forth in the Court's February 7 Opinion and Order, the Court orders disclosure of:

(1) the document attached to the email sent Friday, January 9, 2009 at 3:57 PM, *i.e.*, pages 15 and 16 of the newly produced documents; and

(2) in the email sent Friday, January 16, 2009 at 11:54 AM, the entire fifteen-line second paragraph.

 Turning to the Government's motion for a 60–day stay while it considers whether to appeal,[2] a court considers four factors when deciding whether to grant a stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *In re World Trade Ctr. Disaster Site Li-*

---

1. Peter W. Reddien & Alejandro Sanchez Alvarado, "Fundamentals of Planarian Regeneration," 20 Annual Review of Cell and Developmental Biology 725 (2004).

2. The Government indicates that, if it does appeal, it will seek a further stay from this Court, but that request is not yet ripe for decision.

*tig.*, 503 F.3d 167, 170 (2d Cir.2007) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987)).

■ With respect to the first factor, the Government fails to make any particularized arguments of any material weight. Aside from claims that the email segments ordered to be disclosed are not severable from other, privileged segments (a claim refuted on the face of the emails) and that the segments to be disclosed contain "impressions" rather than "facts" (again refuted on the face of the emails), the Government offers only two arguments as to why the February 7 Opinion and Order was (allegedly) erroneous. *See* Government letter dated February 10, 2012, at 2–3.

First, the Government argues that the Court misapplied the "testimonial use" exception to the work-product protection offered under FOIA's exception 5, which requires that the documents in issue be "routinely" or "normally" disclosed. *Cf. FTC v. Grolier, Inc.*, 462 U.S. 19, 26–27, 103 S.Ct. 2209, 76 L.Ed.2d 387 (1983). In *Grolier*, the Supreme Court held that the fact that the documents in issue had been *ordered* to be disclosed in a prior, separate litigation did not by itself override the work-product protection in a subsequent litigation, because "[i]t is not difficult to imagine litigation in which one party's need for otherwise privileged documents would be sufficient to override the privilege, but that does not remove the documents from the category of the *normally* privileged." *Id.* at 28, 103 S.Ct. 2209. But the reference to "testimonial use" in the Court's February 7 Opinion and Order was in the context of finding that the Government had waived any work-product privilege regarding the segments here disclosed by disclosing their alleged gist (the alleged "policy and practice"). The Government does not cite to any case in which a court has concluded that a party can reclaim a privilege that it has previously waived. Accordingly, the Court finds that this argument does not provide a basis for concluding that the Government will likely succeed on appeal.

Second, the Government argues that the Court's reliance on the provision of 5 U.S.C. § 552(a)(2)(B) that requires disclosure of "statements of policy ... which have been adopted by the agency" was erroneous because "an informal discussion among attorneys does not 'adopt[ ]' a policy." Govt. Letter, 2/10/12 at 3 (citing *Wood v. FBI*, 432 F.3d 78, 84 (2d Cir. 2005)). This argument completely misapprehends the Court's Opinion and Order. It was the OSG itself, in its brief in *Nken*, that expressly represented to the Supreme Court that the Government had adopted a particular "policy" that the Court should rely on. Whether the representation was accurate or inaccurate (which, even with the submission of the new emails, remains problematic), agencies must publish statements of policies they have adopted, *see* 5 U.S.C. § 552(a)(2)(B), and the only thing the Government has listed in response to plaintiffs' FOIA request that even comes close to a particularized statement of the alleged policy and practice is the factual description of it in the email chain, the only part of the chain that the Court has ordered disclosed to plaintiffs.

Despite these weaknesses, however, the Government makes a global argument to the effect that it shows a likelihood of success on appeal simply by pointing out that this case presents some unusual issues as to which very little prior caselaw exists. The Court agrees that the case is, in some respects, a case of first impression. In the analogous context of certifying interlocutory appeals, the Second Circuit has found that the fact "that ... issues are difficult and of first impression" favors certification. *Klinghoffer*

*v. S.N.C. Achille Lauro,* 921 F.2d 21, 25 (2d Cir.1990). The same logic applies here: where the district court has had to address issues as to which the appellate courts have provided little direct guidance, the likelihood that an appellate court will take a different approach increases. In such circumstances, a court should hesitate to impose irreparable harm on a party who may seek appeal.

Moreover, the Court finds that the second, third, and fourth factors do, in fact, favor the Government:

With respect to factor two (irreparable injury to the Government) it is obvious "once there is disclosure, the information belongs to the general public." *Nat'l Archives & Records Admin. v. Favish,* 541 U.S. 157, 174, 124 S.Ct. 1570, 158 L.Ed.2d 319 (2004). Thus, failure to stay the disclosure required by the Order would cause the Government irreparable injury if the ruling was erroneous.

With respect to factor three (injury from the stay to other parties), a stay will cause comparatively little harm, if any, to plaintiffs. Although plaintiffs argue strenuously that the Government continues to deport aliens based on the holding in *Nken,* they refer the Court to no specific cases and they offer nothing more than speculation for the claim that disclosure will induce courts to distinguish *Nken's* holding and prohibit deportation in the relevant circumstances. The proximate harm to plaintiffs themselves, in any event, is simply the delay itself. Although this might loom large if a long delay was granted, at this point the only stay ripe for decision is a stay for 60 days.

With respect to factor four (the public interest), while the Court agrees with plaintiffs that the public has a substantial interest in receiving the information here at issue, the public also has an interest in

having disclosures of secretive government documents reviewed by an appellate court.

Accordingly, the Court finds, that the Government has satisfied all of the four factors, warranting a 60–day stay in the case. The Court therefore grants that stay, effective today.

SO ORDERED.